**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

GOVERNMENT EMPLOYEES INSURANCE
CO., GEICO INDEMNITY CO., GEICO
GENERAL INSURANCE COMPANY, and
GEICO CASUALTY CO.,                                      Case No.:

    Plaintiffs,

                                   **Jury Trial Demanded**

vs.

CHWR, LLC. d/b/a SMART RIDE
WINDSHIELD REPAIR, ANDREW BAKER,
GERALD SALKO, LAWRENCE
TENEBAUM, MICHAEL MERYASH,
BAUMER GROUP, LLC, STEALING HOME,
LLC, and REKABA LLC,

    Defendants.

_____/

**COMPLAINT**

    Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. (collectively "GEICO" or "Plaintiffs"), as and for their Complaint against the Defendants, hereby allege as follows:

**INTRODUCTION**

    1.    This action seeks to terminate an ongoing fraudulent scheme committed against GEICO and, more broadly, the Florida automobile insurance industry, and to recover more than $144,000.00 that the Defendants wrongfully have obtained from GEICO through the submission of hundreds of fraudulent and unlawful claims seeking reimbursement for phony, unnecessary, unlawful, and otherwise non-reimbursable windshield repair services (hereinafter, the "Glass Services") allegedly provided to individuals ("Insureds") who were

eligible for glass repair coverage under comprehensive automobile insurance policies issued by GEICO.

2.      In addition to money damages, GEICO seeks a declaration that it is not legally obligated to pay reimbursement of more than $65,000.00 in outstanding claims for purported Glass Services that have been submitted or caused to be submitted by the Defendants through Defendant CHWR, LLC d/b/a Smart Ride Windshield Repair ("Smart Ride"), because the claims were fraudulent, unlawful, and otherwise non-reimbursable, in that they:

(i)      involved phony Glass Services that were not necessary, reparative, or in some cases actually performed;

(ii)     were the product of illegal, deceptive, unfair, and manipulative conduct directed at GEICO Insureds; and

(iii)    were submitted through Smart Ride, which never actually performed the services, never obtained valid assignments of insurance benefits from the Insureds, and was ineligible to seek reimbursement from GEICO for the claims in the first instance.

3.      As more fully described in this Complaint, this scheme was engineered by the Defendants to create the appearance that Smart Ride was an actual glass repair company that provided Glass Services to Insureds and was in possession of valid assignments of those Insureds' insurance benefits. In reality, Smart Ride was simply a shell entity created and used by Defendants Andrew Baker ("Baker"), Gerald Salko ("Salko"), Lawrence Tenebaum ("Tenebaum"), Michael Meryash ("Meryash"), Baumer Group, LLC (Baumer), and Stealing Home, LLC ("Stealing Home") in furtherance of the Defendants' fraudulent scheme against GEICO, GEICO Insureds, and the Florida automobile insurance industry.

4.      In order to manufacture the large volume of fraudulent claims necessary to financially benefit themselves, the Defendants trained and directed a network of independent

contractors to illegally obtain insurance information from Insureds through deceptive, unfair, and fraudulent means, or to simply forge the Insureds' signatures on claims documents, and then to provide the information and "signatures" to the Defendants. The Defendants then used the illegally-obtained information and "signatures" to manufacture fraudulent claims for Glass Services that they submitted or caused to be submitted to GEICO and other insurers.

5.     As discussed below, the Defendants at all relevant times have known that the charges for the Glass Services that they submitted, or caused to be submitted, to GEICO were fraudulent, unlawful, and otherwise non-reimbursable, in that the charges:

(i)      involved phony Glass Services that were not necessary, reparative, or in some cases actually performed;

(ii)     were the product of illegal, deceptive, unfair, and manipulative conduct directed at GEICO Insureds; and

(iii)    were submitted through Smart Ride, which never actually performed the services, never obtained valid assignments of insurance benefits from the Insureds, and was ineligible to seek reimbursement from GEICO for the claims in the first instance.

6.     As such, the Defendants do not now have – and never had – any right to be compensated for the Glass Services that they billed or caused to be billed to GEICO.

7.     The chart annexed hereto as Exhibit "1" sets forth a representative sample of the fraudulent and unlawful claims for Glass Services that have been identified to-date that the Defendants submitted, or caused to be submitted, to GEICO.

8.     The Defendants' fraudulent scheme began no later than 2016 and has continued uninterrupted through the present day.

9.     As a result of the Defendants' scheme, GEICO has incurred damages of more than $144,000.00, including more than $75,000.00 in damages incurred by GEICO General

Insurance Company, more than $19,000.00 in damages incurred by GEICO Indemnity Co., more than $40,000.00 in damages incurred by Government Employees Insurance Company, and more than $9,000.00 in damages incurred by GEICO Casualty Co.

## THE PARTIES

### I.  Plaintiffs

10.     Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company, and GEICO Casualty Co. (collectively, "GEICO") are Maryland corporations with their principal places of business in Chevy Chase, Maryland. Each Plaintiff is therefore a citizen of Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in the state of Florida. Each of the Plaintiffs was subjected to and the victim of the same fraudulent and unlawful practices by the Defendants.

### II.  Defendants

11.     Defendant Smart Ride is a Texas limited liability company, with a principal place of business in Arizona, that is authorized to transact business in Florida. Smart Ride was originally organized in Texas on January 5, 2008, under the name Chipio Windshield Repair, LLC. Baker, Salko, Tenebaum, and Meryash owned and controlled Smart Ride through Stealing Home and Baumer. Specifically, Baker and Salko owned and controlled Smart Ride through Stealing Home, and Tenebaum and Meyash owned and controlled Smart Ride through Baumer. Together with Defendant Rekaba, LLC ("Rekaba"), Defendants Baker, Salko, Tenebaum, Meryash, Baumer, and Stealing Home (collectively the "Smart Ride Defendants"), caused fraudulent claims for Glass Services to be submitted through Smart Ride to GEICO and other automobile insurers.

4

12.     Defendant Baumer is a California limited liability company with its principal place of business in California. Baumer was organized on November 6, 2008, and is owned and controlled by Tenebaum and Meryash. Together with the other Smart Ride Defendants, Baumer caused fraudulent claims for Glass Services to be submitted through Smart Ride to GEICO and other automobile insurers.

13.     Defendant Stealing Home is a Arizona limited liability company with its principal place of business in Arizona. Stealing Home was organized on April 14, 2009, and is owned and controlled by Baker and Salko. Together with the other Smart Ride Defendants, Stealing Home caused fraudulent claims for Glass Services to be submitted through Smart Ride to GEICO and other automobile insurers.

14.     Defendant Rekaba is a Wyoming limited liability company with its principal place of business in Arizona. Rekaba was organized in Wyoming on August 31, 2012. Baker and Salko owned and controlled Rekaba (Baker, Salko, and Rekaba collectively referred to hereinafter as the "Rekaba Defendants"). Together with the Smart Ride Defendants, the Rekaba Defendants caused fraudulent claims for Glass Services to be submitted through Smart Ride to GEICO and other automobile insurers.

15.     Defendant Baker resides in and is a citizen of California. Together with the other Smart Ride Defendants and Rekaba Defendants, Baker controlled Smart Ride and Rekaba, respectively, and used Smart Ride and Rekaba as vehicles to manufacture and/or submit fraudulent claims for Glass Services to GEICO and other insurers.

16.     Defendant Salko resides in and is a citizen of Arizona. Together with the other Smart Ride Defendants and Rekaba Defendants, Salko controlled Smart Ride and Rekaba,

respectively, and used Smart Ride and Rekaba as vehicles to manufacture and/or submit fraudulent claims for Glass Services to GEICO and other insurers.

17.     Defendant Tenebaum resides in and is a citizen of California. Together with the other Smart Ride Defendants, Tenebaum controlled Smart Ride, and used Smart Ride as a vehicle to submit fraudulent claims for Glass Services to GEICO and other insurers.

18.     Defendant Meryash resides in and is a citizen of California. Together with the other Smart Ride Defendants, Meryash controlled Smart Ride, and used Smart Ride as a vehicle to submit fraudulent claims for Glass Services to GEICO and other insurers.

## JURISDICTION

19.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

20.     Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act) because they arise under the laws of the United States.

21.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

22.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Middle District of Florida is where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

23.     Plaintiff GEICO is an insurance company licensed and authorized to do business in the State of Florida. GEICO underwrites automobile insurance in Florida.

**I.      Automobile Insurance, the Motor Vehicle Repair Act and Reimbursement for Glass Services**

**A.     Comprehensive Insurance Coverage and Claims for Glass Services**

24.     Under Florida law, motorists are required to carry, at a minimum, insurance for personal injury protection ("PIP") and property damage liability ("PDL"). With limited exceptions that are not applicable here, PDL Insurance covers the costs of repairing property damaged in automobile accidents, and PIP Insurance covers the healthcare costs of individuals who are injured in automobile accidents, regardless of who was at fault in the accidents.

25.     In addition to the required PIP and PDL Insurance, a large percentage of Florida automobile owners also carry comprehensive insurance coverage, which provides coverage beyond what is provided through mandatory coverages.  Under comprehensive insurance coverage, repairs for damage outside of the context of covered accidents – such as weather damage or damage caused by factors other than collisions – are covered regardless of fault, subject to specified exclusions and limits of liability as set forth in the pertinent insurance policy.

26.     In the event of damage to the windshield of an Insured's vehicle that has comprehensive insurance coverage, Florida law requires automobile insurers to replace or repair that Insured's damaged windshield with no deductible. See Fla. Stat. § 627.7288.

27.     In a legitimate windshield repair setting, the windshield repair process begins when the Insured submits a notice of loss to GEICO.

28.     GEICO has established multiple means in order to facilitate an Insured's submission of a notice of loss. For example, an Insured can submit the notice of loss either by telephone, or via the internet through a computer or mobile application.

29.     Pursuant to Florida law – and as set forth in GEICO's comprehensive insurance policies – Insureds with comprehensive insurance coverage have the sole discretion to determine who will perform a repair of their windshields. GEICO does not restrict an Insured's choice of windshield repair shops.

30.     As a result, as part of the notice of loss process, Insureds with comprehensive insurance coverage can identify the windshield repair shop that they wish to perform the pertinent Glass Services.

31.     Following the notice of loss, an Insured can assign his or her right to comprehensive insurance coverage benefits – i.e., windshield repair – to their preferred windshield repair shop in exchange for the shop's performance of the Glass Services.

32.     Once the Insured identifies his or her preferred windshield repair shop, GEICO transmits a work order to the Insured's selected shop. The work order sets forth the pricing parameters that GEICO will authorize for the proposed Glass Services.

33.     Then, pursuant to the Insured's assignment of benefits, the windshield repair shop can perform the Glass Services and submit, via the interstate wires, its invoice and any other documents supporting performance of the Glass Services, together with the work order

8

number, to GEICO's claims processing vendor located outside of the state of Florida, using an electronic billing or facsimile transmission system.

34.     The vast majority of all windshield repairs in Florida are billed, and payment is accepted, at the pricing parameters set forth in GEICO's work orders.

35.     Upon receipt of an invoice for windshield repair services provided to an Insured with comprehensive insurance coverage, Florida law generally permits insurers such as GEICO only 30 days to handle the claim. See, e.g., Fla. Stat. § 626.9541.  If insurers such as GEICO do not pay the claim within 30 days, or present some good reason for denying or investigating the claim, they can be liable to the Insured or the Insured's assignee for damages, as well as attorneys' fees, under the Florida Unfair Insurance Trade Practices Act. See id.; see also Fla. Stat. § 624.155.

36.     While the 30-day claims handling period helps to ensure that legitimate claims are paid in a timely manner, it also creates perverse incentives for unscrupulous windshield repair fraud rings, such as the one operated by Defendants.

37.     GEICO receives hundreds of windshield repair claims from Florida Insureds or their assignees every day.

38.     Upon information and belief, other Florida automobile insurers similarly receive a very high volume of windshield repair claims each day. GEICO is only one of many automobile insurance companies in the Florida automobile insurance market, and it is improbable – to the point of impossibility – that only GEICO, and not the other insurers in the market, receives a very high volume of windshield repair claims each day.

39.     Unscrupulous windshield repair fraud rings – including Defendants – are aware of the fact that the volume of windshield repair claims in Florida, coupled with the limited amount of time in which insurers in Florida must handle those claims, limit the insurers' ability to identify and investigate suspicious claims.

40.     Unscrupulous windshield repair fraud rings, such as Defendants, routinely exploit these investigative and temporal limitations, by submitting a massive amount of fraudulent windshield repair claims for illusory, unnecessary, and otherwise non-reimbursable services, often without the Insureds' knowledge or consent.

41.     In this context, the notice of loss process described above plays an important role in ensuring that the windshield repair claims that GEICO receives are legitimate. Among other things, it ensures that the windshield repair shops actually have received legitimate assignments of benefits from GEICO Insureds. It also ensures that the Insureds are aware of the fact that the windshield repair shops have purported to perform work on the Insureds' windshields, and have submitted claims for reimbursement under the Insureds' comprehensive insurance policies.

**B.     The Motor Vehicle Repair Act and Claims for Glass Services**

42.     With limited exceptions that are not applicable in the present case, the Florida Motor Vehicle Repair Act (the "Repair Act"), Fla. Stat. § 559.901, et seq., applies to all motor vehicle repair shops in Florida, including entities such as Smart Ride that purport to provide Glass Services.

10

43.     The Repair Act defines "motor vehicle repair shop", in pertinent part, as "any person who, for compensation, engages or attempts to engage in the repair of motor vehicles owned by other persons and includes, but is not limited to: … shops doing glass work."

44.     The Repair Act requires all motor vehicle repair shops to register with the Florida Department of Agriculture and Consumer Services prior to doing business in Florida. See Fla. Stat. § 559.904.

45.     With limited exceptions that are not applicable in the present case, it is a violation of the Repair Act to, among other things:

(i)      engage or attempt to engage in Glass Services or other forms of motor vehicle repair work without first registering with the Florida Department of Agriculture and Consumer Services;

(ii)     have repair work subcontracted without the knowledge or consent of the customer unless the motor vehicle repair shop or employee thereof demonstrates that the customer could not reasonably have been notified;

(iii)    make or charge for repairs which have not been expressly or impliedly authorized by the customer;

(iv)     misrepresent that repairs have been made to a motor vehicle;

(v)      fraudulently alter any customer contract, estimate, invoice, or other document;

(vi)     misrepresent that the vehicle being inspected or diagnosed is in a dangerous condition or that the customer's continued use of the vehicle may be harmful or cause great damage to the vehicle;

(vii)    make or authorize in any manner or by any means whatever any written or oral statement which is untrue, deceptive or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue, deceptive or misleading;

(viii)   make false promises of a character likely to influence, persuade, or induce a customer to authorize the repair, service, or maintenance of a motor vehicle;

> (ix)   cause or allow a customer to sign any work order that does not state the repairs requested by the customer or the automobile's odometer reading at the time of repair;
>
> (x)   fail or refuse to give to a customer a copy of any document requiring the customer's signature upon completion or cancellation of the repair work; or
>
> (xi)   perform any other act that is a violation of the Repair Act or that constitutes fraud or misrepresentation.

See Fla. Stat. § 559.920.

46.   Pursuant to the Repair Act, if the cost of the proposed repair work will exceed $100.00, a motor vehicle repair shop must present to the customer a written notice conspicuously disclosing the following statement, in a separate, blocked section, in capital letters of at least 12-point type:

> **PLEASE READ CAREFULLY, CHECK ONE OF THE STATEMENTS BELOW, AND SIGN:**
>
> **I UNDERSTAND THAT, UNDER STATE LAW, I AM ENTITLED TO A WRITTEN ESTIMATE IF MY FINAL BILL WILL EXCEED $100.**
>
> **____ I REQUEST A WRITTEN ESTIMATE.**
>
> **____ I DO NOT REQUEST A WRITTEN ESTIMATE AS LONG AS THE REPAIR COSTS DO NOT EXCEED $_____. THE SHOP MAY NOT EXCEED THIS AMOUNT WITHOUT MY WRITTEN OR ORAL APPROVAL.**
>
> **____ I DO NOT REQUEST A WRITTEN ESTIMATE.**
>
> **SIGNED        DATE**

See Fla. Stat. § 559.905(2).

47.   In the event that a motor vehicle repair shop provides the required disclosure notice to a customer pursuant to Fla. Stat. § 559.905(2), and the customer checks off one of the statements indicating that they do not request a written estimate, then the motor vehicle

repair shop is not required to provide the customer with the estimated cost of the proposed repairs. <u>See</u> Fla. Stat. § 559.905(3). Otherwise, motor vehicle repair shops, including Glass Services providers, must provide a written repair estimate to an customer, setting forth – among other things – the estimated cost of the proposed repairs if the cost of the proposed repairs will exceed $100.00. <u>See</u> Fla. Stat. § 559.905(1).

48.     Pursuant to the Repair Act, it is unlawful for a motor vehicle repair shop to require a customer to waive his or her right to an estimate as a precondition to a repair. <u>See</u> Fla. Stat. § 559.907(2).

49.     Pursuant to the Repair Act, it is unlawful for a motor vehicle repair shop to charge more than the written estimate plus $10 or 10 percent, whichever is greater, but not to exceed $50, unless the motor vehicle repair shop has obtained authorization from the customer to exceed the written estimate. <u>See</u> Fla. Stat. § 559.909(3).

50.     Pursuant to the Repair Act, motor vehicle repair shops must provide their customers, upon completion of any repair, with a legible copy of the invoice for the repair. Any such invoice must, among other things, set forth an "itemized description of all labor, parts, and merchandise supplied and the costs thereof", and the "current date and odometer reading of the motor vehicle". <u>See</u> Fla. Stat. § 559.911(3).

51.     Motor vehicle repair shops that violate the Repair Act are not entitled to receive payment for repair work, including Glass Services, even if the repair work otherwise was legitimately and actually performed.

## II.   The Defendants' Fraudulent and Unlawful Scheme

52.     Beginning no later than 2016, and continuing through the present day, Defendants masterminded and implemented a complex fraudulent scheme in which they billed GEICO and other Florida automobile insurers, or caused them to be billed, hundreds of thousands of dollars through Smart Ride for illusory, unnecessary, fraudulent, unlawful, and otherwise non-reimbursable Glass Services.

53.     As set forth herein, Baker, Salko, Tenebaum, and Meryash organized a complex scheme of multiple holding and shell companies to disguise the actual ownership interests in Smart Ride, and conceal their fraudulent and unlawful activities.

## A.   The Structure of the Defendants' Fraudulent Scheme

54.     In early 2016, the Smart Ride Defendants wanted to begin to submit a large amount of fraudulent billing for Glass Services to GEICO and other insurers.

55.     However, the Smart Ride Defendants were concerned that – if they interacted directly with Insureds – the fraudulent scheme described herein could more easily be traced back to them.

56.     What is more, the Smart Ride Defendants did not maintain any vehicles or tools for use in providing Glass Services, and did not maintain any glass inventory. Accordingly, the Smart Ride Defendants could not actually provide any Glass Services to Insureds to support the large amount of fraudulent billing for Glass Services that the Smart Ride Defendants wanted to submit to GEICO and other insurers.

57.     Accordingly, the Smart Ride Defendants engaged independent contractors, including Rekaba, to solicit Insureds to receive Glass Services, and to purport to perform the Glass Services.

58.     For example, during June 21, 2018 depositions, both Baker and Salko gave testimony indicating that Smart Ride acted exclusively as a billing company, did not actually provide any Glass Services itself, and instead subcontracted the purported Glass Services to independent contractors, including Rekaba.

59.     At the direction of the Smart Ride Defendants, these independent contractors, including Rekaba, provided financial consideration to the owners and managers of gas stations and car washes, in exchange for which the owners and managers of the gas stations and car washes permitted the independent contractors to solicit Insureds on the premises to receive Glass Services.

60.     Then, at the direction of the Smart Ride Defendants, these independent contractors, including Rekeba, and their agents, would visit the gas stations and car washes, where they would: (i) solicit Insureds to receive Glass Services through illegal, deceptive, unfair, and manipulative conduct as described herein; or else (ii) simply forge and falsify Glass Services claims in order to create the false appearance that Glass Services actually had been provided to the Insureds, or that the Insureds had authorized the Glass Services.

61.     Thereafter, the independent contractors, including Rekeba, would transmit the Insureds' insurance information and "signatures" back to the Smart Ride Defendants, who would use the insurance information and the Insureds' putative "signatures" to create fraudulent claims for Glass Services that they then submitted to GEICO and other insurers.

62.     For example:

(i)     On August 22, 2016, an Insured named CD visited a Sam's Club gas station. While at the gas station, CD was approached by a Smart Ride independent contractor who offered to "fix" a purported mark on CD's windshield for free. In reliance on the independent contractor's representations, CD authorized the independent contractor to perform a repair. CD did not, however, provide the independent contractor with his insurance information, never authorized a claim to be made against his insurance, and never assigned his insurance benefits to anyone. No legitimate work was actually performed on CD's windshield. Nonetheless, on August 22, 2016, without CD's knowledge or authorization, the Smart Ride Defendants submitted a fraudulent claim to GEICO, seeking reimbursement in the amount of $100.70 for "windshield repair" services purportedly provided to CD's vehicle. The claim falsely stated that CD had assigned his insurance benefits to Smart Ride, and CD's signature was forged on the claim.

(ii)    On October 7, 2016, an Insured named CC visited a Sam's Club gas station. While at the gas station, a Smart Ride independent contractor approached CC and told CC that her windshield could be repaired for free. In fact, there was no damage to CC's windshield, and CC never authorized a windshield repair, never authorized an insurance claim, and never assigned her insurance benefits to anyone. No legitimate work was performed on CC's windshield. Nonetheless, on October 7, 2016, without CC's knowledge or authorization, the Smart Ride Defendants submitted a fraudulent claim to GEICO, seeking reimbursement in the amount of $100.70 for "windshield repair" services purportedly provided to CC's vehicle. The claim falsely stated that CC had assigned her insurance benefits to Smart Ride, and CC's signature was forged on the claim.

(iii)   On or about May 12, 2017, an Insured named TR visited a Sam's Club gas station. While at the gas station, TR was approached by a Smart Ride independent contractor, who offered to conduct a test on a purported chip in TR's windshield. TR allowed the representative to perform the test and initialed a form indicating the test was done. TR, however, never authorized a claim to be made against his insurance, and never assigned his insurance benefits to anyone. Nonetheless, on May 12, 2017, without TR's knowledge or authorization, the Smart Ride Defendants submitted a fraudulent claim to GEICO, seeking reimbursement in the amount of $100.70 for "windshield repair" services purportedly provided to TR's vehicle. The claim falsely stated TR had assigned his insurance benefits to Smart Ride, and TR's signature was forged on the claim.

(iv)    On or about June 1, 2017, an Insured named RR visited a Sam's Club gas station. While at the gas station, two to three Smart Ride independent contractors approached RR's vehicle and applied a liquid onto the windshield without any prior authorization or consent, and despite the fact that there was no damage to RR's vehicle. The Smart Ride independent contractors falsely informed RR that some damage to his windshield could not be seen "with the naked eye", and that the purported service was free. The Smart Ride independent contractors had RR sign a work order under the false pretense that his signature was needed to show there was damage to the windshield if he decided to allow Smart Ride to do a repair at a later date. No legitimate work was performed on RR's windshield. Nonetheless, on June 1, 2017, without RR's knowledge or authorization, the Smart Ride Defendants submitted a fraudulent claim to GEICO, seeking reimbursement in the amount of $100.70 for "windshield repair" services purportedly provided to RR's vehicle.

(v)    On or about September 15, 2017, an Insured named SG visited a Sam's Club gas station. While at the gas station, SG was approached by a Smart Ride independent contractor who offered to fix two purported "dots" on SG's windshield for free. SG indicated she could barely see any "dots" on her windshield. The Smart Ride independent contractor asked for SG's insurance information under the false pretense it was needed to confirm any damage if SG decided to have the windshield replaced at a later date. No legitimate work was ever performed on SG's windshield. Nonetheless, on September, 15, 2017, without SG's knowledge or authorization, the Smart Ride Defendants submitted a fraudulent claim to GEICO, seeking reimbursement in the amount of $100.70 for "windshield repair" services purportedly provided to SG's vehicle.

(vi)    On April 12, 2018, an Insured named CA visited a Sam's Club gas station. While at the gas station, CA was approached by a Rekaba representative, acting as a Smart Ride independent contractor, who offered to perform a test on CA's windshield for free. The Smart Ride independent contractor asked for CA's insurance card under the false pretense that it was needed to document the test, and never mentioned to CA that a claim would be filed against her insurance. Though CA signed a tablet computer provided by the independent contractor to authorize the test, she never authorized an insurance claim, and never assigned her insurance benefits to anyone. Nonetheless, on June 29, 2018, without CA's knowledge or authorization, the Smart Ride Defendants submitted a fraudulent claim to GEICO seeking reimbursement in the amount of $99.95 for "windshield repair" services purportedly provided to CA's vehicle. The claim falsely stated that CA's had assigned her insurance benefits to Smart Ride, and CA's signature was forged on the claim.

(vii)    On April 23, 2018, an Insured named SH visited a Sam's Club gas station. While at the gas station, SH was approached by a Rekaba representative, acting as a Smart Ride independent contractor, who told SH that he could repair SH's windshield for free. In reliance on the independent contractor's representations, SH authorized the Smart Ride independent contractor to perform a "repair" which actually made the windshield worse. SH never authorized an insurance claim, and never assigned his insurance benefits to anyone. Nonetheless, on June 28, 2018, without SH's knowledge or authorization, the Smart Ride Defendants submitted a fraudulent claim to GEICO, seeking reimbursement in the amount of $99.95 for "windshield repair" services purportedly provided to SH's vehicle. The claim falsely stated that SH had assigned his insurance benefits to Smart Ride, and SH's signature was forged on the claim.

(viii)    On or about May 21, 2018, an Insured named JB visited a Sam's Club gas station. While at the gas station, JB was approached by a Rekaba representative, acting as a Smart Ride independent contractor, who stated they were inspecting and repairing windshields. The Smart Ride independent contractor called GEICO in JB's presence to obtain authorization to complete the repair. GEICO told the Smart Ride independent contractor that an inspection was required before the repair could be authorized. The Smart Ride independent contractor then told JB the repair could still be done that day without authorization from GEICO. JB declined the Smart Ride independent contractor's offer to repair the windshield. JB never authorized an insurance claim, and did not assign her insurance benefits to anyone. No work was performed on JB's windshield. Nonetheless, on November 2, 2018, without JB's knowledge or authorization, the Smart Ride Defendants submitted a fraudulent claim to GEICO, seeking reimbursement in the amount of $99.95 for "windshield repair" services purportedly provided to JB's vehicle. The claim falsely stated that JB had assigned her insurance benefits to Smart Ride, and JB's signature was forged on the claim.

(ix)    On or about June 4, 2018, an Insured named AG visited a car wash. While at the car wash, AG was approached by a Rekaba representative, acting as a Smart Ride independent contractor, who stated there was a chip in AG's windshield that could be replaced at no cost to the Insured. The Smart Ride independent contractor called GEICO in AG's presence to obtain authorization to complete the repair. GEICO told the Smart Ride independent contractor that an inspection was required before the repair could be authorized. AG then told the independent contractor that GEICO would have to approve the Glass Services before he would agree to them. No work was performed on AG's windshield at any time. Nonetheless, on June 6, 2018, without AG's knowledge or authorization, the Smart Ride Defendants submitted a fraudulent claim to GEICO, seeking reimbursement in the amount

of $105.95 for "windshield repair" services purportedly provided to AG's vehicle.

(x)     On July 23, 2018, an Insured named NG visited a Sam's Club gas station. While at the gas station, NG was approached by a Rekaba representative, acting as a Smart Ride independent contractor, who offered to repair NG's windshield for free. The Smart Ride independent contractor called GEICO in NG's presence to obtain authorization to complete the repair. GEICO told the Smart Ride independent contractor that an inspection was required before the repair could be authorized. The Smart Ride independent contractor then had NG sign a work order under the false pretense that his signature was needed to allow Smart Ride to do the repair at a later date. No work was performed on NG's windshield at any time. Nonetheless, on November 16, 2018, without NG's knowledge or authorization, the Smart Ride Defendants submitted a fraudulent claim to GEICO, seeking reimbursement in the amount of $99.95 for "windshield repair" services purportedly provided to NG's vehicle.

**B.     The Unlawful Subcontracting of Glass Services to Independent Contractors, and Misrepresentations that Smart Ride Provided the Glass Services**

63.     At all relevant times, Smart Ride was registered as a motor vehicle repair shop with the Florida Department of Agriculture and Consumer Services.

64.     However, as set forth above, from the inception of the Defendants' scheme in 2016, to the present, the Smart Ride Defendants did not provide any actual Glass Services to GEICO Insureds in the first instance. Rather, the Smart Ride Defendants subcontracted all of the purported Glass Services to independent contractors, including Rekaba.

65.     By electing to treat the actual Glass Services providers (to the extent that the Glass Services ever actually were performed at all) as independent contractors, the Smart Ride Defendants realized significant economic benefits – for instance:

(i)     avoiding the obligation to collect and remit income tax as required by 26 U.S.C. § 3102;

(ii)    avoiding payment of the FUTA excise tax required by 26 U.S.C. § 3301 (6.2 percent of all income paid);

(iii)    avoiding payment of the FICA excise tax required by 26 U.S.C. § 3111 (7.65 percent of all income paid);

(iv)    avoiding payment of workers' compensation insurance; and

(v)    avoiding claims of agency-based liability arising from work performed by the independent contractors.

66.    In virtually all the claims identified in Exhibit "1" from 2016 and 2017, the Smart Ride Defendants utilized two different independent contractors, namely entities called "KingCo, Inc." and "Bulldog Industries, Inc.", which at the direction of the Smart Ride Defendants sent their agents to solicit Insureds in gas stations and car washes, and to purport to perform any resulting Glass Services.

67.    However, in 2018, the Smart Ride Defendants started using Rekaba as their independent contractor, because the Smart Ride Defendants wanted to decrease the amount the Smart Ride Defendants paid to the independent contractors, which they could accomplish by using Rekaba, which Baker and Salko controlled.

68.    Upon information and belief, neither KingCo Inc., nor Bulldog Industries, Inc., nor Rekaba were registered with the Florida Department of Agriculture and Consumer Services as motor vehicle repair shops during the period when Smart Ride billed GEICO for the purported Glass Services.

69.    For example, during his June 21, 2018, deposition, Salko gave testimony indicating that he did not believe that any of the independent contractors who performed the Glass Services that were billed through Smart Ride to GEICO were themselves registered as motor vehicle repair shops.

70.     As set forth above, the Repair Act provides – among other things – that it is unlawful for any motor vehicle repair shop to "[h]ave repair work subcontracted without the knowledge or consent of the customer unless the motor vehicle repair shop or employee thereof demonstrates that the customer could not reasonably have been notified." See Fla. Stat. § 559.920

71.     In the claims for Glass Services that are identified in Exhibit "1", none of the purported Glass Services actually were performed by Smart Ride or its employees. Rather, all of the purported Glass Services in the claims identified in Exhibit "1" were performed – to the extent that they were performed at all – by independent contractors, including Rekaba, KingCo Inc., and Bulldog Industries, Inc., to whom Smart Ride unlawfully subcontracted the putative repair work without notice to the Insureds.

72.     In the claims for Glass Services that are identified in Exhibit "1", none of the Insureds knew, or consented to, the fact that Smart Ride subcontracted the putative repair work to unlicensed independent contractors. Although the independent contractors would sometimes present work orders to the Insureds which stated that the Glass Services "may be performed and completed by a subcontractor", the Insureds never were put on notice that Smart Ride actually did subcontract the purported Glass Services to unlicensed independent contractors. To the extent that the Insureds were aware that any Glass Services were being performed on their vehicles at all, they were led by the Defendants to believe that the work was being performed by Smart Ride, a licensed repair shop. By extension, the Insureds were never put on notice that the independent contractors were not registered with the Florida Department of Agriculture and Consumer Services as motor vehicle repair shops.

21

73.     In other instances, the independent contractors would never present the Insured with any such work order in the first instance, thereby preventing the Insureds from knowing that there was even a possibility that the purported Glass Services might be subcontracted.

74.     In the claims for Glass Services that are identified in Exhibit "1", each of the Insureds reasonably could have been notified that the Defendants actually had subcontracted the purported Glass Services to unlicensed independent contractors. For example, the Defendants had ample opportunity to convey this information to each of the Insureds in the claims identified in Exhibit "1", including at the times when the independent contractors first solicited or purported to solicit the Insureds, and during the time when the Smart Ride independent contractors purported to perform the Glass Services on the Insureds' vehicles. Instead, in many instances, the independent contractors told the Insureds they were employed by Smart Ride, when in fact they were not.

75.     In the claims for Glass Services that are identified in Exhibit "1", the Smart Ride Defendants fraudulently billed for the purported Glass Services as if they had been performed by Smart Ride or its employees in order to conceal the fact that they had unlawfully subcontracted the purported Glass Services to unlicensed independent contractors, without notice to the Insureds or to GEICO, in violation of the Repair Act.

76.     For example:

(i)     On or about March 16, 2016, the Smart Ride Defendants billed GEICO for Glass Services that Smart Ride purportedly provided to an Insured named FR. In their bill for the Glass Services, the Smart Ride Defendants falsely represented that the Glass Services actually had been performed by Smart Ride or its employees. In fact, to the extent that the Glass Services were performed in the first instance, they were performed by an unlicensed

independent contractor to whom Smart Ride unlawfully subcontracted the repair work, without the knowledge or consent of FR, despite the fact that the Smart Ride Defendants reasonably could have notified FR of their intention to subcontract the Glass Services.

(ii)     On or about October 14, 2016, the Smart Ride Defendants billed GEICO for Glass Services that Smart Ride purportedly provided to an Insured named CL. In their bill for the Glass Services, the Smart Ride Defendants falsely represented that the Glass Services actually had been performed by Smart Ride or its employees. In fact, to the extent that the Glass Services were performed in the first instance, they were performed by an unlicensed independent contractor to whom Smart Ride unlawfully subcontracted the repair work, without the knowledge or consent of CL, despite the fact that the Smart Ride Defendants reasonably could have notified CL of their intention to subcontract the Glass Services.

(iii)    On or about November 16, 2016, the Smart Ride Defendants billed GEICO for Glass Services that Smart Ride purportedly provided to an Insured named RS. In their bill for the Glass Services, the Smart Ride Defendants falsely represented that the Glass Services actually had been performed by Smart Ride or its employees. In fact, to the extent that the Glass Services were performed in the first instance, they were performed by an unlicensed independent contractor to whom Smart Ride unlawfully subcontracted the repair work, without the knowledge or consent of RS, despite the fact that the Smart Ride Defendants reasonably could have notified RS of their intention to subcontract the Glass Services.

(iv)    On or about January 19, 2017, the Smart Ride Defendants billed GEICO for Glass Services that Smart Ride purportedly provided to an Insured named CR. In their bill for the Glass Services, the Smart Ride Defendants falsely represented that the Glass Services actually had been performed by Smart Ride or its employees. In fact, to the extent that the Glass Services were performed in the first instance, they were performed by an unlicensed independent contractor to whom Smart Ride unlawfully subcontracted the repair work, without the knowledge or consent of CR, despite the fact that the Smart Ride Defendants reasonably could have notified CR of their intention to subcontract the Glass Services.

(v)     On or about January 30, 2017, the Smart Ride Defendants billed GEICO for Glass Services that Smart Ride purportedly provided to an Insured named MV. In their bill for the Glass Services, the Smart Ride Defendants falsely represented that the Glass Services actually had been performed by Smart Ride or its employees. In fact, to the extent that the Glass Services were performed in the first instance, they were performed by an unlicensed

independent contractor to whom Smart Ride unlawfully subcontracted the repair work, without the knowledge or consent of MV, despite the fact that the Smart Ride Defendants reasonably could have notified MV of their intention to subcontract the Glass Services.

(vi)     On or about February 7, 2017, the Smart Ride Defendants billed GEICO for Glass Services that Smart Ride purportedly provided to an Insured named AH. In their bill for the Glass Services, the Smart Ride Defendants falsely represented that the Glass Services actually had been performed by Smart Ride or its employees. In fact, to the extent that the Glass Services were performed in the first instance, they were performed by an unlicensed independent contractor to whom Smart Ride unlawfully subcontracted the repair work, without the knowledge or consent of AH, despite the fact that the Smart Ride Defendants reasonably could have notified AH of their intention to subcontract the Glass Services.

(vii)    On or about February 28, 2017, the Smart Ride Defendants billed GEICO for Glass Services that Smart Ride purportedly provided to an Insured named NS. In their bill for the Glass Services, the Smart Ride Defendants falsely represented that the Glass Services actually had been performed by Smart Ride or its employees. In fact, to the extent that the Glass Services were performed in the first instance, they were performed by an unlicensed independent contractor to whom Smart Ride unlawfully subcontracted the repair work, without the knowledge or consent of NS, despite the fact that the Smart Ride Defendants reasonably could have notified NS of their intention to subcontract the Glass Services.

(viii)   On or about April 12, 2017, the Smart Ride Defendants billed GEICO for Glass Services that Smart Ride purportedly provided to an Insured named EO. In their bill for the Glass Services, the Smart Ride Defendants falsely represented that the Glass Services actually had been performed by Smart Ride or its employees. In fact, to the extent that the Glass Services were performed in the first instance, they were performed by an unlicensed independent contractor to whom Smart Ride unlawfully subcontracted the repair work, without the knowledge or consent of EO, despite the fact that the Smart Ride Defendants reasonably could have notified EO of their intention to subcontract the Glass Services.

(ix)     On or about April 28, 2017, the Smart Ride Defendants billed GEICO for Glass Services that Smart Ride purportedly provided to an Insured named DS. In their bill for the Glass Services, the Smart Ride Defendants falsely represented that the Glass Services actually had been performed by Smart Ride or its employees. In fact, to the extent that the Glass Services were performed in the first instance, they were performed by an unlicensed

independent contractor to whom Smart Ride unlawfully subcontracted the repair work, without the knowledge or consent of DS, despite the fact that the Smart Ride Defendants reasonably could have notified DS of their intention to subcontract the Glass Services.

(x)    On or about May 11, 2017, the Smart Ride Defendants billed GEICO for Glass Services that Smart Ride purportedly provided to an Insured named DD. In their bill for the Glass Services, the Smart Ride Defendants falsely represented that the Glass Services actually had been performed by Smart Ride or its employees. In fact, to the extent that the Glass Services were performed in the first instance, they were performed by an unlicensed independent contractor to whom Smart Ride unlawfully subcontracted the repair work, without the knowledge or consent of DD, despite the fact that the Smart Ride Defendants reasonably could have notified DD of their intention to subcontract the Glass Services.

(xi)   On or about June 21, 2017, the Smart Ride Defendants billed GEICO for Glass Services that Smart Ride purportedly provided to an Insured named CC. In their bill for the Glass Services, the Smart Ride Defendants falsely represented that the Glass Services actually had been performed by Smart Ride or its employees. In fact, to the extent that the Glass Services were performed in the first instance, they were performed by an unlicensed independent contractor to whom Smart Ride unlawfully subcontracted the repair work, without the knowledge or consent of CC, despite the fact that the Smart Ride Defendants reasonably could have notified CC of their intention to subcontract the Glass Services.

(xii)  On or about July 24, 2017, the Smart Ride Defendants billed GEICO for Glass Services that Smart Ride purportedly provided to an Insured named AR. In their bill for the Glass Services, the Smart Ride Defendants falsely represented that the Glass Services actually had been performed by Smart Ride or its employees. In fact, to the extent that the Glass Services were performed in the first instance, they were performed by an unlicensed independent contractor to whom Smart Ride unlawfully subcontracted the repair work, without the knowledge or consent of AR, despite the fact that the Smart Ride Defendants reasonably could have notified AR of their intention to subcontract the Glass Services.

(xiii) On or about August 2, 2017, the Smart Ride Defendants billed GEICO for Glass Services that Smart Ride purportedly provided to an Insured named CM. In their bill for the Glass Services, the Smart Ride Defendants falsely represented that the Glass Services actually had been performed by Smart Ride or its employees. In fact, to the extent that the Glass Services were performed in the first instance, they were performed by an unlicensed

independent contractor to whom Smart Ride unlawfully subcontracted the repair work, without the knowledge or consent of CM, despite the fact that the Smart Ride Defendants reasonably could have notified CM of their intention to subcontract the Glass Services.

(xiv)    On or about March 3, 2018, the Smart Ride Defendants billed GEICO for Glass Services that Smart Ride purportedly provided to an Insured named EZ. In their bill for the Glass Services, the Smart Ride Defendants falsely represented that the Glass Services actually had been performed by Smart Ride or its employees. In fact, to the extent that the Glass Services were performed in the first instance, they were performed by Rekaba, an unlicensed independent contractor to whom Smart Ride unlawfully subcontracted the repair work, without the knowledge or consent of EZ, despite the fact that the Smart Ride Defendants reasonably could have notified EZ of their intention to subcontract the Glass Services.

(xv)    On or about March 8, 2018, the Smart Ride Defendants billed GEICO for Glass Services that Smart Ride purportedly provided to an Insured named DB. In their bill for the Glass Services, the Smart Ride Defendants falsely represented that the Glass Services actually had been performed by Smart Ride or its employees. In fact, to the extent that the Glass Services were performed in the first instance, they were performed by Rekaba, an unlicensed independent contractor to whom Smart Ride unlawfully subcontracted the repair work, without the knowledge or consent of DB, despite the fact that the Smart Ride Defendants reasonably could have notified DB of their intention to subcontract the Glass Services.

(xvi)    On or about May 7, 2018, the Smart Ride Defendants billed GEICO for Glass Services that Smart Ride purportedly provided to an Insured named PF. In their bill for the Glass Services, the Smart Ride Defendants falsely represented that the Glass Services actually had been performed by Smart Ride or its employees. In fact, to the extent that the Glass Services were performed in the first instance, they were performed by Rekaba, an unlicensed independent contractor to whom Smart Ride unlawfully subcontracted the repair work, without the knowledge or consent of PF, despite the fact that the Smart Ride Defendants reasonably could have notified PF of their intention to subcontract the Glass Services.

(xvii)    On or about May 8, 2018, the Smart Ride Defendants billed GEICO for Glass Services that Smart Ride purportedly provided to an Insured named PC. In their bill for the Glass Services, the Smart Ride Defendants falsely represented that the Glass Services actually had been performed by Smart Ride or its employees. In fact, to the extent that the Glass Services were performed in the first instance, they were performed by Rekaba, an unlicensed independent

contractor to whom Smart Ride unlawfully subcontracted the repair work, without the knowledge or consent of PC, despite the fact that the Smart Ride Defendants reasonably could have notified PC of their intention to subcontract the Glass Services.

(xviii)   On or about June 28, 2018, the Smart Ride Defendants billed GEICO for Glass Services that Smart Ride purportedly provided to an Insured named VS. In their bill for the Glass Services, the Smart Ride Defendants falsely represented that the Glass Services actually had been performed by Smart Ride or its employees. In fact, to the extent that the Glass Services were performed in the first instance, they were performed by Rekaba, an unlicensed independent contractor to whom Smart Ride unlawfully subcontracted the repair work, without the knowledge or consent of VS, despite the fact that the Smart Ride Defendants reasonably could have notified VS of their intention to subcontract the Glass Services.

(xix)   On or about July 2, 2018, the Smart Ride Defendants billed GEICO for Glass Services that Smart Ride purportedly provided to an Insured named JP. In their bill for the Glass Services, the Smart Ride Defendants falsely represented that the Glass Services actually had been performed by Smart Ride or its employees. In fact, to the extent that the Glass Services were performed in the first instance, they were performed by Rekaba, an unlicensed independent contractor to whom Smart Ride unlawfully subcontracted the repair work, without the knowledge or consent of JP, despite the fact that the Smart Ride Defendants reasonably could have notified JP of their intention to subcontract the Glass Services.

(xx)   On or about November 14, 2018, the Smart Ride Defendants billed GEICO for Glass Services that Smart Ride purportedly provided to an Insured named CG. In their bill for the Glass Services, the Smart Ride Defendants falsely represented that the Glass Services actually had been performed by Smart Ride or its employees. In fact, to the extent that the Glass Services were performed in the first instance, they were performed by Rekaba, an unlicensed independent contractor to whom Smart Ride unlawfully subcontracted the repair work, without the knowledge or consent of CG, despite the fact that the Smart Ride Defendants reasonably could have notified CG of their intention to subcontract the Glass Services.

77.   These are only representative examples. In the claims for Glass Services that are identified in Exhibit "1", the Smart Ride Defendants always unlawfully subcontracted the repair work to unlicensed independent contractors, without the knowledge or consent of the

Insureds, despite the fact that the Smart Ride Defendants reasonably could have notified the Insureds of their intention to subcontract the Glass Services. Instead, in many instances, the independent contractors – at the direction of the Smart Ride Defendants – deliberately misled the Insureds to believe that they were employees of Smart Ride.

78.     In each of the claims for Glass Services identified in Exhibit "1", the Smart Ride Defendants falsely represented that Smart Ride was operating in compliance with the Repair Act and was eligible to collect comprehensive insurance benefits in the first instance. In fact, Smart Ride never was operating in compliance with the Repair Act, and never was entitled to collect comprehensive insurance benefits, because the Smart Ride Defendants unlawfully subcontracted the pertinent repair work to unlicensed independent contractors without notice to the Insureds, and then falsely represented to GEICO and to the Insureds that the Glass Services actually had been performed by Smart Ride or its employees.

79.     In each of the claims for Glass Services that are identified in Exhibit "1", the Smart Ride Defendants also falsely represented that Smart Ride had valid assignments of comprehensive insurance benefits from the pertinent Insureds. In fact, Smart Ride never had valid assignments of benefits from the pertinent Insureds, because the purported "assignments" – to the extent they existed at all – falsely represented that the Insured had assigned his or her right to comprehensive insurance benefits to Smart Ride in consideration for the glass repairs performed by Smart Ride. However, and as set forth herein, Smart Ride never actually provided any Glass Services to the Insureds.

80.     What is more, upon information and belief as set forth above, the independent contractors to whom the Smart Ride Defendants unlawfully subcontracted the Glass Services

were not themselves registered as motor vehicle repair shops with the Florida Department of Agriculture and Consumer Services, a further violation of the Repair Act that likewise divested Smart Ride of any right to collect comprehensive insurance benefits in connection with the Glass Services claims.

**C.     The Defendants' Failure to Comply with the Written Estimate Provisions of the Repair Act**

81.     Additionally, in many of the claims for Glass Services that are identified in Exhibit "1", the Defendants never complied with the written estimate provisions of the Repair Act.

82.     In particular, and as set forth above, if the cost of the proposed Glass Services will exceed $100.00, the Repair Act requires motor vehicle repair shops to present a written notice to the customer, using specific statutory language, in a separate, blocked section, in capital letters of at least 12-point type, advising the customer of his or her right to a written estimate and giving the customer the ability to elect or decline to receive the estimate. See Fla. Stat. § 559.905(2).

83.     In many of the claim for Glass Services that are identified in Exhibit "1", the cost of the purported Glass Services exceeded $100.00.

84.     However, in the Glass Services claims identified in Exhibit "1", while the requisite language was printed on the underlying work orders, the language was routinely crossed out, thereby creating the false appearance that the written estimate notice was not applicable to the Insureds, and preventing the Insureds from exercising their right to elect or decline to receive the estimates pursuant to Fla. Stat. § 559.905(2).

85.     For example:

(i)     On or about June 12, 2016, the Smart Ride Defendants billed GEICO for Glass Services that Smart Ride purported to provide to an Insured named DG, despite the fact that – in actuality – the Smart Ride Defendants unlawfully subcontracted the Glass Services to an unlicensed independent contractor, without notice to DG. The cost of the purported Glass Services exceeded $100.00. Though the Smart Ride Defendants purported to provide DG with a work order containing the written estimate notice language required by Fla. Stat. § 559.905(2), the notice language had been crossed out, thereby creating the false appearance that the written estimate notice was not applicable to DG, and preventing DG from exercising the right to elect or decline to receive the estimate pursuant to Fla. Stat. § 559.905(2).

(ii)    On or about October 14, 2016, the Smart Ride Defendants billed GEICO for Glass Services that Smart Ride purported to provide to an Insured named CL, despite the fact that – in actuality – the Smart Ride Defendants unlawfully subcontracted the Glass Services to an unlicensed independent contractor, without notice to CL. The cost of the purported Glass Services exceeded $100.00. Though the Smart Ride Defendants purported to provide CL with a work order containing the written estimate notice language required by Fla. Stat. § 559.905(2), the notice language had been crossed out, thereby creating the false appearance that the written estimate notice was not applicable to CL, and preventing CL from exercising the right to elect or decline to receive the estimate pursuant to Fla. Stat. § 559.905(2).

(iii)   On or about November 16, 2016, the Smart Ride Defendants billed GEICO for Glass Services that Smart Ride purported to provide to an Insured named RS, despite the fact that – in actuality – the Smart Ride Defendants unlawfully subcontracted the Glass Services to an unlicensed independent contractor, without notice to RS. The cost of the purported Glass Services exceeded $100.00. Though the Smart Ride Defendants purported to provide RS with a work order containing the written estimate notice language required by Fla. Stat. § 559.905(2), the notice language had been crossed out, thereby creating the false appearance that the written estimate notice was not applicable to RS, and preventing RS from exercising the right to elect or decline to receive the estimate pursuant to Fla. Stat. § 559.905(2).

(iv)    On or about January 30, 2017, the Smart Ride Defendants billed GEICO for Glass Services that Smart Ride purported to provide to an Insured named MV, despite the fact that – in actuality – the Smart Ride Defendants unlawfully subcontracted the Glass Services to an unlicensed independent contractor, without notice to MV. The cost of the purported Glass Services exceeded $100.00. Though the Smart Ride Defendants purported to provide MV with a work order containing the written estimate notice language required by Fla. Stat. § 559.905(2), the notice language had been crossed out, thereby creating

the false appearance that the written estimate notice was not applicable to MV, and preventing MV from exercising the right to elect or decline to receive the estimate pursuant to Fla. Stat. § 559.905(2).

(v)     On or about February 3, 2017, the Smart Ride Defendants billed GEICO for Glass Services that Smart Ride purported to provide to an Insured named YR, despite the fact that – in actuality – the Smart Ride Defendants unlawfully subcontracted the Glass Services to an unlicensed independent contractor, without notice to YR. The cost of the purported Glass Services exceeded $100.00. Though the Smart Ride Defendants purported to provide YR with a work order containing the written estimate notice language required by Fla. Stat. § 559.905(2), the notice language had been crossed out, thereby creating the false appearance that the written estimate notice was not applicable to YR, and preventing YR from exercising the right to elect or decline to receive the estimate pursuant to Fla. Stat. § 559.905(2).

(vi)    On or about February 14, 2017, the Smart Ride Defendants billed GEICO for Glass Services that Smart Ride purported to provide to an Insured named JC, despite the fact that – in actuality – the Smart Ride Defendants unlawfully subcontracted the Glass Services to an unlicensed independent contractor, without notice to JC. The cost of the purported Glass Services exceeded $100.00. Though the Smart Ride Defendants purported to provide JC with a work order containing the written estimate notice language required by Fla. Stat. § 559.905(2), the notice language had been crossed out, thereby creating the false appearance that the written estimate notice was not applicable to JC, and preventing JC from exercising the right to elect or decline to receive the estimate pursuant to Fla. Stat. § 559.905(2).

(vii)   On or about February 28, 2017, the Smart Ride Defendants billed GEICO for Glass Services that Smart Ride purported to provide to an Insured named NS, despite the fact that – in actuality – the Smart Ride Defendants unlawfully subcontracted the Glass Services to an unlicensed independent contractor, without notice to NS. The cost of the purported Glass Services exceeded $100.00. Though the Smart Ride Defendants purported to provide NS with a work order containing the written estimate notice language required by Fla. Stat. § 559.905(2), the notice language had been crossed out, thereby creating the false appearance that the written estimate notice was not applicable to NS, and preventing NS from exercising the right to elect or decline to receive the estimate pursuant to Fla. Stat. § 559.905(2).

(viii)  On or about March 15, 2017, the Smart Ride Defendants billed GEICO for Glass Services that Smart Ride purported to provide to an Insured named WR, despite the fact that – in actuality – the Smart Ride Defendants unlawfully subcontracted the Glass Services to an unlicensed independent contractor,

without notice to WR. The cost of the purported Glass Services exceeded $100.00. Though the Smart Ride Defendants purported to provide WR with a work order containing the written estimate notice language required by Fla. Stat. § 559.905(2), the notice language had been crossed out, thereby creating the false appearance that the written estimate notice was not applicable to WR, and preventing WR from exercising the right to elect or decline to receive the estimate pursuant to Fla. Stat. § 559.905(2).

(ix)    On or about March 21, 2017, the Smart Ride Defendants billed GEICO for Glass Services that Smart Ride purported to provide to an Insured named NS, despite the fact that – in actuality – the Smart Ride Defendants unlawfully subcontracted the Glass Services to an unlicensed independent contractor, without notice to NS. The cost of the purported Glass Services exceeded $100.00. Though the Smart Ride Defendants purported to provide NS with a work order containing the written estimate notice language required by Fla. Stat. § 559.905(2), the notice language had been crossed out, thereby creating the false appearance that the written estimate notice was not applicable to NS, and preventing NS from exercising the right to elect or decline to receive the estimate pursuant to Fla. Stat. § 559.905(2).

(x)    On or about March 29, 2017, the Smart Ride Defendants billed GEICO for Glass Services that Smart Ride purported to provide to an Insured named CH, despite the fact that – in actuality – the Smart Ride Defendants unlawfully subcontracted the Glass Services to an unlicensed independent contractor, without notice to CH. The cost of the purported Glass Services exceeded $100.00. Though the Smart Ride Defendants purported to provide CH with a work order containing the written estimate notice language required by Fla. Stat. § 559.905(2), the notice language had been crossed out, thereby creating the false appearance that the written estimate notice was not applicable to CH, and preventing CH from exercising the right to elect or decline to receive the estimate pursuant to Fla. Stat. § 559.905(2).

(xi)    On or about April 12, 2017, the Smart Ride Defendants billed GEICO for Glass Services that Smart Ride purported to provide to an Insured named ZS, despite the fact that – in actuality – the Smart Ride Defendants unlawfully subcontracted the Glass Services to an unlicensed independent contractor, without notice to ZS. The cost of the purported Glass Services exceeded $100.00. Though the Smart Ride Defendants purported to provide ZS with a work order containing the written estimate notice language required by Fla. Stat. § 559.905(2), the notice language had been crossed out, thereby creating the false appearance that the written estimate notice was not applicable to ZS, and preventing ZS from exercising the right to elect or decline to receive the estimate pursuant to Fla. Stat. § 559.905(2).

(xii)   On or about April 12, 2017, the Smart Ride Defendants billed GEICO for Glass Services that Smart Ride purported to provide to an Insured named EO, despite the fact that – in actuality – the Smart Ride Defendants unlawfully subcontracted the Glass Services to an unlicensed independent contractor, without notice to EO. The cost of the purported Glass Services exceeded $100.00. Though the Smart Ride Defendants purported to provide EO with a work order containing the written estimate notice language required by Fla. Stat. § 559.905(2), the notice language had been crossed out, thereby creating the false appearance that the written estimate notice was not applicable to EO, and preventing EO from exercising the right to elect or decline to receive the estimate pursuant to Fla. Stat. § 559.905(2).

(xiii)  On or about April 14, 2017, the Smart Ride Defendants billed GEICO for Glass Services that Smart Ride purported to provide to an Insured named MD, despite the fact that – in actuality – the Smart Ride Defendants unlawfully subcontracted the Glass Services to an unlicensed independent contractor, without notice to MD. The cost of the purported Glass Services exceeded $100.00. Though the Smart Ride Defendants purported to provide MD with a work order containing the written estimate notice language required by Fla. Stat. § 559.905(2), the notice language had been crossed out, thereby creating the false appearance that the written estimate notice was not applicable to MD, and preventing MD from exercising the right to elect or decline to receive the estimate pursuant to Fla. Stat. § 559.905(2).

(xiv)   On or about April 21, 2017, the Smart Ride Defendants billed GEICO for Glass Services that Smart Ride purported to provide to an Insured named TR, despite the fact that – in actuality – the Smart Ride Defendants unlawfully subcontracted the Glass Services to an unlicensed independent contractor, without notice to TR. The cost of the purported Glass Services exceeded $100.00. Though the Smart Ride Defendants purported to provide TR with a work order containing the written estimate notice language required by Fla. Stat. § 559.905(2), the notice language had been crossed out, thereby creating the false appearance that the written estimate notice was not applicable to TR, and preventing TR from exercising the right to elect or decline to receive the estimate pursuant to Fla. Stat. § 559.905(2).

(xv)    On or about April 28, 2017, the Smart Ride Defendants billed GEICO for Glass Services that Smart Ride purported to provide to an Insured named DS, despite the fact that – in actuality – the Smart Ride Defendants unlawfully subcontracted the Glass Services to an unlicensed independent contractor, without notice to DS. The cost of the purported Glass Services exceeded $100.00. Though the Smart Ride Defendants purported to provide DS with a work order containing the written estimate notice language required by Fla. Stat. § 559.905(2), the notice language had been crossed out, thereby creating

33

the false appearance that the written estimate notice was not applicable to DS, and preventing DS from exercising the right to elect or decline to receive the estimate pursuant to Fla. Stat. § 559.905(2).

(xvi)    On or about May 11, 2017, the Smart Ride Defendants billed GEICO for Glass Services that Smart Ride purported to provide to an Insured named RM, despite the fact that – in actuality – the Smart Ride Defendants unlawfully subcontracted the Glass Services to an unlicensed independent contractor, without notice to RM. The cost of the purported Glass Services exceeded $100.00. Though the Smart Ride Defendants purported to provide RM with a work order containing the written estimate notice language required by Fla. Stat. § 559.905(2), the notice language had been crossed out, thereby creating the false appearance that the written estimate notice was not applicable to RM, and preventing RM from exercising the right to elect or decline to receive the estimate pursuant to Fla. Stat. § 559.905(2).

(xvii)   On or about May 11, 2017, the Smart Ride Defendants billed GEICO for Glass Services that Smart Ride purported to provide to an Insured named DD, despite the fact that – in actuality – the Smart Ride Defendants unlawfully subcontracted the Glass Services to an unlicensed independent contractor, without notice to DD. The cost of the purported Glass Services exceeded $100.00. Though the Smart Ride Defendants purported to provide DD with a work order containing the written estimate notice language required by Fla. Stat. § 559.905(2), the notice language had been crossed out, thereby creating the false appearance that the written estimate notice was not applicable to DD, and preventing DD from exercising the right to elect or decline to receive the estimate pursuant to Fla. Stat. § 559.905(2).

(xviii)  On or about June 30, 2017, the Smart Ride Defendants billed GEICO for Glass Services that Smart Ride purported to provide to an Insured named JP, despite the fact that – in actuality – the Smart Ride Defendants unlawfully subcontracted the Glass Services to an unlicensed independent contractor, without notice to JP. The cost of the purported Glass Services exceeded $100.00. Though the Smart Ride Defendants purported to provide JP with a work order containing the written estimate notice language required by Fla. Stat. § 559.905(2), the notice language had been crossed out, thereby creating the false appearance that the written estimate notice was not applicable to JP, and preventing JP from exercising the right to elect or decline to receive the estimate pursuant to Fla. Stat. § 559.905(2).

(xix)    On or about March 8, 2018, the Smart Ride Defendants billed GEICO for Glass Services that Smart Ride purported to provide to an Insured named DB, despite the fact that – in actuality – the Smart Ride Defendants unlawfully subcontracted the Glass Services to Rekaba, unlicensed an independent

contractor, without notice to DB. The cost of the purported Glass Services exceeded $100.00. Though the Smart Ride Defendants purported to provide DB with a work order containing the written estimate notice language required by Fla. Stat. § 559.905(2), the notice language had been crossed out, thereby creating the false appearance that the written estimate notice was not applicable to DB, and preventing DB from exercising the right to elect or decline to receive the estimate pursuant to Fla. Stat. § 559.905(2).

(xx)   On or about March 8, 2018, the Smart Ride Defendants billed GEICO for Glass Services that Smart Ride purported to provide to an Insured named EZ, despite the fact that – in actuality – the Smart Ride Defendants unlawfully subcontracted the Glass Services to Rekaba, an unlicensed independent contractor, without notice to EZ. The cost of the purported Glass Services exceeded $100.00. Though the Smart Ride Defendants purported to provide EZ with a work order containing the written estimate notice language required by Fla. Stat. § 559.905(2), the notice language had been crossed out, thereby creating the false appearance that the written estimate notice was not applicable to EZ, and preventing EZ from exercising the right to elect or decline to receive the estimate pursuant to Fla. Stat. § 559.905(2).

86.   These are only representative examples. In the claims for Glass Services that are identified in Exhibit "1", the Smart Ride Defendants routinely failed to comply with the written estimate provisions of the Repair Act.

**D.   The Defendants' Failure to Comply with the Invoice and Work Order Provisions of the Repair Act**

87.   What is more, in the claims for Glass Services that are identified in Exhibit "1", the Smart Ride Defendants almost never complied with the invoice provisions of the Repair Act.

88.   Specifically, and as set forth above, Fla. Stat. § 559.911 provides that motor vehicle repair shops must provide their customers, upon completion of any repair, with a legible copy of the invoice for the repair. Any such invoice must, among other things, set forth an "itemized description of all labor, parts, and merchandise supplied and the costs thereof", and the "current date and odometer reading of the motor vehicle".

89.     However, in the claims identified in Exhibit "1", the Smart Ride Defendants and Rekaba Defendants virtually always failed – upon the completion of any purported Glass Services – to provide the Insureds with copies of invoices for the repairs that set forth an "itemized description of all labor, parts, and merchandise supplied and the costs thereof", and the "current date and odometer reading of the motor vehicle".

90.     To the contrary, in the claims for Glass Services that are identified in Exhibit "1", the Smart Ride Defendants routinely: (i) purported to have the Insureds sign work orders which did not set forth how much Smart Ride intended to charge for the purported Glass Services; and then (ii) failed to provide any invoice to the Insureds upon the purported completion of the Glass Services, thereby preventing the Insureds from ever learning how much the Smart Ride Defendants billed GEICO for the purported Glass Services.

91.     For example:

(i)     On or about October 14, 2016, the Smart Ride Defendants purported to provide Glass Services to an Insured named CL, which they then billed through Smart Ride to GEICO. The Smart Ride Defendants never provided CL with a copy of the invoice for the repairs that set forth an "itemized description of all labor, parts, and merchandise supplied and the costs thereof".

(ii)    On or about November 16, 2016, the Smart Ride Defendants purported to provide Glass Services to an Insured named RS, which they then billed through Smart Ride to GEICO. The Smart Ride Defendants never provided RS with a copy of the invoice for the repairs that set forth an "itemized description of all labor, parts, and merchandise supplied and the costs thereof".

(iii)   On or about January 19, 2017, the Smart Ride Defendants purported to provide Glass Services to an Insured named CR, which they then billed through Smart Ride to GEICO. The Smart Ride Defendants never provided CR with a copy of the invoice for the repairs that set forth an "itemized description of all labor, parts, and merchandise supplied and the costs thereof".

(iv)     On or about February 28, 2017, the Smart Ride Defendants purported to provide Glass Services to an Insured named NS, which they then billed through Smart Ride to GEICO. The Smart Ride Defendants never provided NS with a copy of the invoice for the repairs that set forth an "itemized description of all labor, parts, and merchandise supplied and the costs thereof".

(v)      On or about April 12, 2017, the Smart Ride Defendants purported to provide Glass Services to an Insured named EO, which they then billed through Smart Ride to GEICO. The Smart Ride Defendants never provided EO with a copy of the invoice for the repairs that set forth an "itemized description of all labor, parts, and merchandise supplied and the costs thereof".

(vi)     On or about May 11, 2017, the Smart Ride Defendants purported to provide Glass Services to an Insured named DD, which they then billed through Smart Ride to GEICO. The Smart Ride Defendants never provided DD with a copy of the invoice for the repairs that set forth an "itemized description of all labor, parts, and merchandise supplied and the costs thereof".

(vii)    On or about July 21, 2017, the Smart Ride Defendants purported to provide Glass Services to an Insured named AR, which they then billed through Smart Ride to GEICO. The Smart Ride Defendants never provided AR with a copy of the invoice for the repairs that set forth an "itemized description of all labor, parts, and merchandise supplied and the costs thereof".

(viii)   On or about August 2, 2017, the Smart Ride Defendants purported to provide Glass Services to an Insured named CM, which they then billed through Smart Ride to GEICO. The Smart Ride Defendants never provided CM with a copy of the invoice for the repairs that set forth an "itemized description of all labor, parts, and merchandise supplied and the costs thereof".

(ix)     On or about March 15, 2018, the Smart Ride Defendants purported to provide Glass Services to an Insured named PC, which they then billed through Smart Ride to GEICO. The Smart Ride Defendants never provided PC with a copy of the invoice for the repairs that set forth an "itemized description of all labor, parts, and merchandise supplied and the costs thereof".

(x)      On or about March 19, 2018, the Smart Ride Defendants purported to provide Glass Services to an Insured named VS, which they then billed through Smart Ride to GEICO. The Smart Ride Defendants never provided VS with a copy of the invoice for the repairs that set forth an "itemized description of all labor, parts, and merchandise supplied and the costs thereof".

(xi)     On or about April 9, 2018, the Smart Ride Defendants purported to provide Glass Services to an Insured named JP, which they then billed through Smart Ride to GEICO. The Smart Ride Defendants never provided JP with a copy of the invoice for the repairs that set forth an "itemized description of all labor, parts, and merchandise supplied and the costs thereof".

(xii)    On or about May 18, 2018, the Smart Ride Defendants purported to provide Glass Services to an Insured named MR, which they then billed through Smart Ride to GEICO. The Smart Ride Defendants never provided MR with a copy of the invoice for the repairs that set forth an "itemized description of all labor, parts, and merchandise supplied and the costs thereof".

(xiii)   On or about May 23, 2018, the Smart Ride Defendants purported to provide Glass Services to an Insured named JS, which they then billed through Smart Ride to GEICO. The Smart Ride Defendants never provided JS with a copy of the invoice for the repairs that set forth an "itemized description of all labor, parts, and merchandise supplied and the costs thereof".

(xiv)    On or about August 20, 2018, the Smart Ride Defendants purported to provide Glass Services to an Insured named CG, which they then billed through Smart Ride to GEICO. The Smart Ride Defendants never provided CG with a copy of the invoice for the repairs that set forth an "itemized description of all labor, parts, and merchandise supplied and the costs thereof".

(xv)     On or about August 23, 2018, the Smart Ride Defendants purported to provide Glass Services to an Insured named SH, which they then billed through Smart Ride to GEICO. The Smart Ride Defendants never provided SH with a copy of the invoice for the repairs that set forth an "itemized description of all labor, parts, and merchandise supplied and the costs thereof".

92.     These are only representative examples. In the claims for Glass Services that are identified in Exhibit "1", the Smart Ride Defendants routinely and unlawfully failed to provide the Insureds, upon completion of the purported Glass Services, with a legible copy of the invoice for the repair which set forth an "itemized description of all labor, parts, and merchandise supplied and the costs thereof".

93.     Moreover, in the claims identified in Exhibit "1", even in the limited instances when the Smart Ride Defendants actually provided the Insureds with invoices for their

purported Glass Services, the invoices virtually always failed to set forth the odometer reading of the pertinent vehicles.

94. To the contrary, in the claims that are identified in Exhibit "1", almost none of the Smart Ride Defendants' invoices set forth the odometer readings for the pertinent vehicles.

95. Furthermore, in the claims for Glass Services that are identified in Exhibit "1", the Smart Ride Defendants routinely and unlawfully caused or permitted the Insureds to sign work orders that did not state the automobiles' odometer readings at the time of the purported repairs.

96. For example:

(i) On or about November 16, 2016, the Smart Ride Defendants purported to provide Glass Services to an Insured named RS. In connection with the purported Glass Services, the Smart Ride Defendants unlawfully caused or permitted RS to sign a work order that failed to set forth the odometer reading of the vehicle, and unlawfully failed to provide RS with an invoice that set forth the odometer reading of the vehicle.

(ii) On or about February 14, 2017, the Smart Ride Defendants purported to provide Glass Services to an Insured named JC. In connection with the purported Glass Services, the Smart Ride Defendants unlawfully caused or permitted JC to sign a work order that failed to set forth the odometer reading of the vehicle, and unlawfully failed to provide JC with an invoice that set forth the odometer reading of the vehicle.

(iii) On or about January 30, 2017, the Smart Ride Defendants purported to provide Glass Services to an Insured named MV. In connection with the purported Glass Services, the Smart Ride Defendants unlawfully caused or permitted MV to sign a work order that failed to set forth the odometer reading of the vehicle, and unlawfully failed to provide MV with an invoice that set forth the odometer reading of the vehicle.

(iv) On or about March 21, 2017, the Smart Ride Defendants purported to provide Glass Services to an Insured named CC. In connection with the purported Glass Services, the Smart Ride Defendants unlawfully caused or permitted CC

to sign a work order that failed to set forth the odometer reading of the vehicle, and unlawfully failed to provide CC with an invoice that set forth the odometer reading of the vehicle.

(v)     On or about April 28, 2017, the Smart Ride Defendants purported to provide Glass Services to an Insured named DS. In connection with the purported Glass Services, the Smart Ride Defendants unlawfully caused or permitted DS to sign a work order that failed to set forth the odometer reading of the vehicle, and unlawfully failed to provide DS with an invoice that set forth the odometer reading of the vehicle.

(vi)    On or about May 23, 2017, the Smart Ride Defendants purported to provide Glass Services to an Insured named CL. In connection with the purported Glass Services, the Smart Ride Defendants unlawfully caused or permitted CL to sign a work order that failed to set forth the odometer reading of the vehicle, and unlawfully failed to provide CL with an invoice that set forth the odometer reading of the vehicle.

(vii)   On or about June 8, 2017, the Smart Ride Defendants purported to provide Glass Services to an Insured named KM. In connection with the purported Glass Services, the Smart Ride Defendants unlawfully caused or permitted KM to sign a work order that failed to set forth the odometer reading of the vehicle, and unlawfully failed to provide KM with an invoice that set forth the odometer reading of the vehicle.

(viii)  On or about June 16, 2017, the Smart Ride Defendants purported to provide Glass Services to an Insured named EM. In connection with the purported Glass Services, the Smart Ride Defendants unlawfully caused or permitted EM to sign a work order that failed to set forth the odometer reading of the vehicle, and unlawfully failed to provide EM with an invoice that set forth the odometer reading of the vehicle.

(ix)    On or about June 30, 2017, the Smart Ride Defendants purported to provide Glass Services to an Insured named JP. In connection with the purported Glass Services, the Smart Ride Defendants unlawfully caused or permitted JP to sign a work order that failed to set forth the odometer reading of the vehicle, and unlawfully failed to provide JP with an invoice that set forth the odometer reading of the vehicle.

(x)     On or about February 2, 2018, the Smart Ride Defendants purported to provide Glass Services to an Insured named RW. In connection with the purported Glass Services, the Smart Ride Defendants and Rekaba Defendants unlawfully caused or permitted RW to sign a work order that failed to set forth

the odometer reading of the vehicle, and unlawfully failed to provide RW with an invoice that set forth the odometer reading of the vehicle.

(xi)    On or about March 8, 2018, the Smart Ride Defendants purported to provide Glass Services to an Insured named DB. In connection with the purported Glass Services, the Smart Ride Defendants unlawfully caused or permitted DB to sign a work order that failed to set forth the odometer reading of the vehicle, and unlawfully failed to provide DB with an invoice that set forth the odometer reading of the vehicle.

(xii)   On or about March 15, 2018, the Smart Ride Defendants purported to provide Glass Services to an Insured named PC. In connection with the purported Glass Services, the Smart Ride Defendants unlawfully caused or permitted PC to sign a work order that failed to set forth the odometer reading of the vehicle, and unlawfully failed to provide PC with an invoice that set forth the odometer reading of the vehicle.

(xiii)  On or about March 19, 2018, the Smart Ride Defendants purported to provide Glass Services to an Insured named VS. In connection with the purported Glass Services, the Smart Ride Defendants unlawfully caused or permitted VS to sign a work order that failed to set forth the odometer reading of the vehicle, and unlawfully failed to provide VS with an invoice that set forth the odometer reading of the vehicle.

(xiv)   On or about April 9, 2018, the Smart Ride Defendants purported to provide Glass Services to an Insured named JP. In connection with the purported Glass Services, the Smart Ride Defendants unlawfully caused or permitted JP to sign a work order that failed to set forth the odometer reading of the vehicle, and unlawfully failed to provide JP with an invoice that set forth the odometer reading of the vehicle.

(xv)    On or about August 20, 2018, the Smart Ride Defendants purported to provide Glass Services to an Insured named CG. In connection with the purported Glass Services, the Smart Ride Defendants unlawfully caused or permitted CG to sign a work order that failed to set forth the odometer reading of the vehicle, and unlawfully failed to provide CG with an invoice that set forth the odometer reading of the vehicle.

97.    These are only representative examples. In the claims for Glass Services that are identified in Exhibit "1", the Smart Ride Defendants routinely and unlawfully: (i) failed to provide the Insureds with copies of invoices that set forth the odometer readings of the

vehicles; and (ii) caused or permitted the Insureds to sign work orders that failed to set forth the odometer readings of the vehicles.

98.     In each of the claims for Glass Services identified in Exhibit "1", the Smart Ride Defendants falsely represented that Smart Ride was operating in compliance with the Repair Act and was eligible to collect comprehensive insurance benefits in the first instance. In fact, Smart Ride never was operating in compliance with the Repair Act, and never was entitled to collect comprehensive insurance benefits, because the Smart Ride Defendants: (i) failed to provide the Insureds with copies of invoices that set forth the odometer readings of the vehicles; and (ii) caused or permitted the Insureds to sign work orders that failed to set forth the odometer readings of the vehicles.

**E.     The Forgeries of Insureds' Signatures on Glass Services Claim Documents**

99.     Not only did the Smart Ride Defendants unlawfully subcontract all of their purported Glass Services to independent contractors, including Rekaba, without notice to the Insureds, falsely represent that the Glass Services had actually been performed by Smart Ride or its employees, fail to comply with the written estimate provisions of the Repair Act, and fail to comply with the invoice and work order provisions of the Repair Act, but the Smart Ride Defendants – based on sworn statements by, and interviews with, numerous GEICO Insureds – also routinely and unlawfully forged Insureds' signatures on documents they submitted to GEICO in support of their Glass Services claims, or caused Insureds' signatures to be forged on the documents.

100.    The Smart Ride Defendants engaged in this conduct in order to create the false appearance that Insureds had authorized the performance of the purported Glass

Services, assigned their comprehensive insurance benefits to Smart Ride, had waived their

right to written estimates, and had received itemized copies of the invoices for the purported

Glass Services.

101.   For example:

(i)   On or about October 7, 2016, the Smart Ride Defendants purported to provide Glass Services to an Insured named CC, and then submitted a claim to GEICO for the purported Glass Services. In support of the claim, the Smart Ride Defendants submitted a work order and assignment of comprehensive insurance benefits to GEICO on which they forged CC's signature. In actuality, the Smart Ride Defendants never provided any Glass Services to CC, and CC never signed any work order or assignment of benefits related to the purported Glass Services.

(ii)   On or about January 26, 2017, the Smart Ride Defendants purported to provide Glass Services to an Insured named CL, and then submitted a claim to GEICO for the purported Glass Services. In support of the claim, the Smart Ride Defendants submitted a work order and assignment of comprehensive insurance benefits to GEICO on which they forged CL's signature. In actuality, the Smart Ride Defendants never provided any Glass Services to CL, and CL never signed any work order or assignment of benefits related to the purported Glass Services.

(iii)   On or about February 10, 2017, the Smart Ride Defendants purported to provide Glass Services to an Insured named PC, and then submitted a claim to GEICO for the purported Glass Services. In support of the claim, the Smart Ride Defendants submitted a work order and assignment of comprehensive insurance benefits to GEICO on which they forged PC's signature. In actuality, the Smart Ride Defendants never provided any Glass Services to PC, and PC never signed any work order or assignment of benefits related to the purported Glass Services.

(iv)   On or about June 8, 2017, the Smart Ride Defendants purported to provide Glass Services to an Insured named DM, and then submitted a claim to GEICO for the purported Glass Services. In support of the claim, the Smart Ride Defendants submitted a work order and assignment of comprehensive insurance benefits to GEICO on which they forged DM's signature. In actuality, the Smart Ride Defendants never provided any Glass Services to DM, and DM never signed any work order or assignment of benefits related to the purported Glass Services.

(v)    On or about September 14, 2017, the Smart Ride Defendants purported to provide Glass Services to an Insured named TT, and then submitted a claim to GEICO for the purported Glass Services. In support of the claim, the Smart Ride Defendants submitted a work order and assignment of comprehensive insurance benefits to GEICO on which they forged TT's signature. In actuality, the Smart Ride Defendants never provided any Glass Services to TT, and TT never signed any work order or assignment of benefits related to the purported Glass Services.

(vi)    On or about February 15, 2018, the Smart Ride Defendants purported to provide Glass Services to an Insured named BT, and then submitted a claim to GEICO for the purported Glass Services. In support of the claim, the Smart Ride Defendants submitted a work order and assignment of comprehensive insurance benefits to GEICO on which they forged BT's signature. In actuality, BT never signed the work order or assignment of benefits related to the purported Glass Services.

(vii)    On or about April 23, 2018, the Smart Ride Defendants purported to provide Glass Services to an Insured named SH, and then submitted a claim to GEICO for the purported Glass Services. In support of the claim, the Smart Ride Defendants submitted a work order and assignment of comprehensive insurance benefits to GEICO on which they forged SH's signature. In actuality, SH never signed the work order or assignment of benefits related to the purported Glass Services.

(viii)    On or about May 8, 2018, the Smart Ride Defendants purported to provide Glass Services to an Insured named MR, and then submitted a claim to GEICO for the purported Glass Services. In support of the claim, the Smart Ride Defendants submitted a work order and assignment of comprehensive insurance benefits to GEICO, or caused them to be submitted, on which they forged MR's signature. In actuality, MR never signed the work order or assignment of benefits related to the purported Glass Services.

(ix)    On or about May 23, 2018, the Smart Ride Defendants purported to provide Glass Services to an Insured named JS, and then submitted a claim to GEICO for the purported Glass Services. In support of the claim, the Smart Ride Defendants submitted a work order and assignment of comprehensive insurance benefits to GEICO, or caused them to be submitted, on which they forged JS's signature. In actuality, JS never signed the work order or assignment of benefits related to the purported Glass Services.

(x)    On or about December 5, 2018, the Smart Ride Defendants and Rekaba Defendants purported to provide Glass Services to an Insured named ZN, and then submitted a claim to GEICO for the purported Glass Services. In support

of the claim, the Smart Ride Defendants submitted a work order and assignment of comprehensive insurance benefits to GEICO, or caused them to be submitted, on which they forged ZN's signature. In actuality, the Defendants never provided any Glass Services to ZN, and ZN never signed any work order or assignment of benefits related to the purported Glass Services.

102.    These are only representative examples. In the claims for Glass Services that are identified in Exhibit "1", the Smart Ride Defendants routinely forged Insureds' signatures on work orders and assignments of benefits, or caused the Insureds' signatures to be forged on the documents, in order to create the false appearance that the Insureds had authorized the performance of the purported Glass Services, assigned their comprehensive insurance benefits to Smart Ride, had waived their right to written estimates, and had received itemized copies of the invoices for the purported Glass Services.

103.    In each of the claims for Glass Services identified in Exhibit "1", the Defendants falsely represented that Smart Ride was operating in compliance with the Repair Act and was eligible to collect comprehensive insurance benefits in the first instance. In fact, Smart Ride never was operating in compliance with the Repair Act, and never was entitled to collect comprehensive insurance benefits, because the Defendants: (i) made or charged for repairs that had not been authorized by their purported customers; (ii) fraudulently altered documents in support of the claims; (iii) made or authorized untrue, deceptive or misleading statements in support of the claims; and (iv) and engaged in pervasive fraud and misrepresentation in connection with the claims.

**F.      The Defendants' Exploitation of Florida Insurance Claims Handling Requirements to Conceal and Perpetuate the Scheme**

104.    As set forth above, the Defendants knew that – upon receipt of an invoice for windshield repair services provided to an Insured with comprehensive insurance coverage – Florida law generally permits insurers such as GEICO only 30 days to handle the claim. See, e.g., Fla. Stat. § 626.9541.

105.    The Defendants also knew that, if insurers such as GEICO do not pay a claim within 30 days, or present some good reason for denying or investigating the claim, they can be liable to the Insured or the Insured's assignee for damages, as well as attorneys' fees, under the Florida Unfair Insurance Trade Practices Act. See id.; see also Fla. Stat. § 624.155.

106.    In this context, the Defendants submitted virtually of their claims for Glass Services to GEICO after they had falsely purported to provide the pertinent Glass Services because they knew that: (i) this time-frame severely limited GEICO's ability to verify the claims; and (ii) forced GEICO to rely on the claims or else face the prospect of suits for damages and attorneys' fees under the Florida Unfair Insurance Trade Practices Act.

**III.     The Fraudulent and Unlawful Claims the Defendants Submitted or Caused to be Submitted to GEICO**

107.    To support the fraudulent charges, the Defendants systematically submitted or caused to be submitted hundreds of fraudulent and unlawful claims to GEICO through Smart Ride seeking payment for Glass Services for which the Defendants were not entitled to receive payment.

108.    Each of the claims for purported Glass Services that is identified in Exhibit "1" was submitted or caused to be submitted by the Smart Ride Defendants via interstate wire transmission to GEICO's claims processing vendor in Columbus, Ohio.

109.    The Glass Services claims that the Defendants submitted or caused to be submitted to GEICO were false, misleading, and/or unlawful in that they:

(i)     involved phony Glass Services that were not necessary, reparative, or in some cases actually performed;

(ii)    were the product of illegal, deceptive, unfair, and manipulative conduct directed at GEICO Insureds; and

(iii)   were submitted through Smart Ride, which never actually performed the services, never obtained valid assignments of insurance benefits from the Insureds, and was ineligible to seek reimbursement from GEICO for the claims in the first instance.

## IV.    The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

110.    The Defendants were legally and ethically obligated to act honestly and with integrity in connection with their purported performance of the Glass Services and their submission of charges to GEICO.

111.    To induce GEICO to promptly pay the fraudulent charges for the Glass Services, the Defendants have systemically concealed their fraud and have gone to great lengths to accomplish this concealment.

112.    Specifically, the Defendants knowingly misrepresented and concealed facts related to the Glass Services in an effort to prevent discovery that Smart Ride never performed the underlying Glass Services, lacked valid assignments of benefits from the pertinent Insureds, and therefore lacked standing to collect on the Glass Services in the first instance.

113.    What is more, the Defendants knowingly misrepresented and concealed facts related to the purported Glass Services in an effort to prevent discovery that the Glass Services were the product of illegal, deceptive, unfair, and manipulative conduct directed at GEICO Insureds, and in many cases involved purported Glass Services that were not necessary, reparative, or in some cases actually performed

114.    Furthermore, the Defendants deliberately avoided the ordinary notice of loss process and exploited Florida's claims handling requirements in order to force GEICO to process their fraudulent claims within a highly abbreviated time-frame, and compel GEICO to rely on their facially-valid claims submissions.

115.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially-valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO has incurred damages of more than $144,000.00, including more than $75,000.00 in damages incurred by GEICO General Insurance Company, more than $19,000.00 in damages incurred by GEICO Indemnity Co., more than $40,000.00 in damages incurred by Government Employees Insurance Company, and more than $9,000.00 in damages incurred by GEICO Casualty Co.

116.    Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

**FIRST CAUSE OF ACTION**
**Against Smart Ride**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

117.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 116 above.

118.    There is an actual case in controversy between GEICO and Smart Ride regarding more than $65,000.00 in fraudulent claims for the purported Glass Services that has been submitted through Smart Ride to GEICO.

119.    Smart Ride has no right to receive payment for any pending bills submitted to GEICO because Smart Ride is not and never has been in compliance with the Repair Act.

120.    Smart Ride has no right to receive payment for any pending bills submitted to GEICO because it did not actually provide the Glass Services at issue, and lacked valid assignments of benefits from the Insureds.

121.    Smart Ride has no right to receive payment for any pending bills submitted to GEICO because the bills misrepresented that Smart Ride was authorized by the pertinent Insureds to file a claim against their insurance policy, when in fact it was not.

122.    Smart Ride has no right to receive payment for any pending bills submitted to GEICO because the purported Glass Services were, in many cases, not necessary, reparative, or in some cases actually performed.

123.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Smart Ride has no right to receive payment for any pending claims submitted to GEICO.

**SECOND CAUSE OF ACTION**
**Against Baker, Salko, Tenebaum, Meryash, Baumer, and Stealing Home**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

124.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 116 above.

125.    Smart Ride is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

126.    Baker, Salko, Tenebaum, Meryash, Baumer, and Stealing Home have knowingly conducted and/or participated, directly or indirectly, in the conduct of Smart Ride's affairs through a pattern of racketeering activity consisting of repeated violations of the federal wire fraud statute, 18 U.S.C. § 1343, based upon the use of the wires in interstate commerce to submit or cause to be submitted hundreds of fraudulent claims for Glass Services on a continuous basis for more than three years seeking insurance payments under GEICO insurance policies that Smart Ride was never entitled to receive because: (i) the claims involved phony Glass Services that were not necessary, reparative, or in some cases actually performed; (ii) the claims were the product of illegal, deceptive, unfair, and manipulative conduct directed at GEICO Insureds; and (iii) the claims were submitted through Smart Ride, which never actually performed the services, never obtained valid assignments of insurance benefits from the Insureds, and was ineligible to seek reimbursement from GEICO for the claims in the first instance because of the Defendants' pervasive violations of the Repair Act. A representative sample of the fraudulent bills and corresponding facsimiles submitted to GEICO that comprise, in part, the pattern of

racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

127.    Smart Ride's business is racketeering activity, inasmuch as the enterprise exists solely for the purpose of submitting fraudulent charges to Florida automobile insurers. The predicate acts of wire fraud are the regular way in which Baker, Salko, Tenebaum, Meryash, Baumer, and Stealing Home operate Smart Ride, insofar as Smart Ride was never eligible to bill GEICO or other automobile insurers for the Glass Services, and the acts of wire fraud therefore are essential in order for Smart Ride, to function.  Furthermore, the intricate planning required to carry out and conceal the predicate acts of wire fraud implies a threat of continued criminal activity, as does the fact that attempts to collect on the fraudulent billing submitted through Smart Ride, continue to the present day.

128.    Smart Ride is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Smart Ride, in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent Glass Services billing.

129.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $144,000.00 pursuant to the fraudulent claims submitted through Smart Ride, including more than $75,000.00 in damages incurred by GEICO General Insurance Company, more than $19,000.00 in damages incurred by GEICO Indemnity Co., more than $40,000.00 in damages incurred by Government Employees Insurance Company, and more than $9,000.00 in damages incurred by GEICO Casualty Co.

**THIRD CAUSE OF ACTION**
**Against Baker, Salko, Tenebaum, Meryash, Baumer, Stealing Home, and Rekaba**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

130.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 116 above.

131.    Smart Ride is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

132.    Baker, Salko, Tenebaum, Meryash, Baumer, Stealing Home, and Rekaba knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Smart Ride enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal wire fraud statute, 18 U.S.C. § 1343, based upon the use of the wires in interstate commerce to submit or cause to be submitted hundreds of fraudulent claims for Glass Services on a continuous basis for more than three years seeking insurance payments under GEICO insurance policies that Smart Ride was never entitled to receive because: (i) the claims were the product of illegal, deceptive, unfair, and manipulative conduct directed at GEICO Insureds; and (ii) the claims were submitted through Smart Ride, which never actually performed the services, never obtained valid assignments of insurance benefits from the Insureds, and was ineligible to seek reimbursement from GEICO for the claims in the first instance because of the Defendants' pervasive violations of the Repair Act. A representative sample of the fraudulent bills and corresponding claim submissions submitted to GEICO using wires in interstate commerce that comprise, in part, the pattern of racketeering activity identified through the

date of this Complaint are described, in part, in the charts annexed hereto as Exhibit "1". Each such wire transmission was made in furtherance of the wire fraud scheme.

133.   Baker, Salko, Tenebaum, Meryash, Baumer, Stealing Home, and Rekaba knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

134.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $144,000.00 pursuant to the fraudulent bills submitted through the Smart Ride enterprise, including more than $75,000.00 in damages incurred by GEICO General Insurance Company, more than $19,000.00 in damages incurred by GEICO Indemnity Co., more than $40,000.00 in damages incurred by Government Employees Insurance Company, and more than $9,000.00 in damages incurred by GEICO Casualty Co.

135.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

136.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**FOURTH CAUSE OF ACTION**
**Against All Defendants**
**(Under Fla. Stat. § 501.201 et. seq.)**

137.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 116 above.

138.   The Defendants are actively engaged in trade and commerce in the State of Florida.

139.   GEICO and its Insureds are "consumers" as defined by Fla. Stat. 501.203.

140.   The Defendants engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain comprehensive insurance benefits from GEICO.

141.   The bills and supporting documents submitted or caused to be submitted by the Defendants to GEICO were fraudulent and unlawful in that they: (i) involved phony Glass Services that were not necessary, reparative, or in some cases actually performed; (ii) were the product of illegal, deceptive, unfair, and manipulative conduct directed at GEICO Insureds; and (iii) were submitted through Smart Ride, which never actually performed the services, never obtained valid assignments of insurance benefits from the Insureds, and was ineligible to seek reimbursement from GEICO for the claims in the first instance.

142.   Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous.   Additionally, the conduct of the Defendants has been materially injurious to GEICO and its Insureds.

143.   The conduct of the Defendants was the actual and proximate cause of the damages sustained by GEICO.

144.     The Defendants' unfair and deceptive acts have caused GEICO to sustain damages of at least $144,000.00, including more than $75,000.00 in damages incurred by GEICO General Insurance Company, more than $19,000.00 in damages incurred by GEICO Indemnity Co., more than $40,000.00 in damages incurred by Government Employees Insurance Company, and more than $9,000.00 in damages incurred by GEICO Casualty Co.

145.     By reason of the Defendants' conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2).

**FIFTH CAUSE OF ACTION**
**Against Baker, Salko, Tenebaum, Meryash, Baumer, and Stealing Home**
**(Under Fla. Stat. § 772.103(3))**

146.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 116 above.

147.     Smart Ride is an ongoing "enterprise," as that term is defined in Fla. Stat. § 772.102(3), that engages in activities that constitute a pattern of criminal activity.

148.     Baker, Salko, Tenebaum, Meryash, Baumer, and Stealing Home knowingly have conducted and/or participated, directly or indirectly, in the conduct of Smart Ride's affairs through a pattern of criminal activity consisting of repeated acts constituting insurance fraud in violation of Fla. Stat. § 817.234(1)(a), by submitting or causing to be submitted hundreds of fraudulent claims to GEICO seeking payment under comprehensive insurance policies issued by GEICO to its Insureds, when the billing contained false and misleading information concerning facts material to the claims for which reimbursement was being sought in that: (i) the claims involved phony Glass Services that were not necessary, reparative, or in some cases actually performed; (ii) the claims were the product of illegal,

deceptive, unfair, and manipulative conduct directed at GEICO Insureds; and (iii) the claims were submitted through Smart Ride, which never actually performed the services, never obtained valid assignments of insurance benefits from the Insureds, and was ineligible to seek reimbursement from GEICO for the claims in the first instance because of the Defendants' pervasive violations of the Repair Act.

149.    These knowing and intentional acts constitute a pattern of criminal activity, in that said acts constitute insurance fraud in violation of Fla. Stat. § 817.234(1)(a).

150.    Smart Ride is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Smart Ride in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

151.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $144,000.00 pursuant to the fraudulent bills submitted through the Smart Ride enterprise, including more than $75,000.00 in damages incurred by GEICO General Insurance Company, more than $19,000.00 in damages incurred by GEICO Indemnity Co., more than $40,000.00 in damages incurred by Government Employees Insurance Company, and more than $9,000.00 in damages incurred by GEICO Casualty Co.

152.    By reason of Baker, Salko, Tenebaum, Meryash, Baumer, and Stealing Home's conduct, GEICO is also entitled to recover threefold the actual damages it actually sustained, reasonable attorney's fees, and court costs pursuant to Fla. Stat. § 772.104.

**SIXTH CAUSE OF ACTION**
**Against Baker, Salko, Tenebaum, Meryash, Baumer, Stealing Home, and Rekaba**
**(Under Fla. Stat. 772.103(4))**

153.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 116 above.

154.    Smart Ride is an ongoing "enterprise," as that term is defined in Fla. Stat. § 772.102(3), that engages in activities that constitute a pattern of criminal activity.

155.    Baker, Salko, Tenebaum, Meryash, Baumer, Stealing Home, and Rekaba are employed by or associated with the Smart Ride enterprise.

156.    In furtherance of the fraudulent scheme, Baker, Salko, Tenebaum, Meryash, Baumer, Stealing Home, and Rekaba submitted or caused to be submitted hundreds of fraudulent claims through Smart Ride to GEICO seeking payment under automobile insurance policies issued by GEICO to Florida Insureds.

157.    When the billing was submitted, Baker, Salko, Tenebaum, Meryash, Baumer, Stealing Home, and Rekaba knew that the billing contained false and misleading information concerning facts material to the claims for which reimbursement was being sought in that: (i) the claims involved phony Glass Services that were not necessary, reparative, or in some cases actually performed; (ii) the claims were the product of illegal, deceptive, unfair, and manipulative conduct directed at GEICO Insureds; and (iii) the claims were submitted through Smart Ride, which never actually performed the services, never obtained valid assignments of insurance benefits from the Insureds, and was ineligible to seek reimbursement from GEICO for the claims in the first instance because of the Defendants' pervasive violations of the Repair Act.

158.    These knowing and intentional acts constitute a pattern of criminal activity, in that said acts constitute insurance fraud in violation of Fla. Stat. § 817.234(1)(a).

159.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $144,000.00 pursuant to the fraudulent bills submitted through the Smart Ride enterprise, including more than $75,000.00 in damages incurred by GEICO General Insurance Company, more than $19,000.00 in damages incurred by GEICO Indemnity Co., more than $40,000.00 in damages incurred by Government Employees Insurance Company, and more than $9,000.00 in damages incurred by GEICO Casualty Co.

160.    By reason of Baker, Salko, Tenebaum, Meryash, Baumer, Stealing Home, and Rekaba's conduct, GEICO is also entitled to recover threefold the actual damages it actually sustained, reasonable attorney's fees, and court costs pursuant to Fla. Stat. § 772.104.

## SEVENTH CAUSE OF ACTION
### Against All Defendants
### (Common Law Fraud)

161.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 116 above.

162.    The Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO in the course of their submission of hundreds of fraudulent and unlawful claims for purported Glass Services.

163.    The claims submitted to GEICO constituted false and fraudulent statements of material fact in that: (i) Smart Ride never actually provided any Glass Services to GEICO Insureds, and lacked valid assignments of benefits from GEICO Insureds; (ii) the putative

Glass Services were not necessary, reparative, or in some cases actually performed; (iii) the claims falsely represented that Smart Ride was eligible to receive payment for the purported Glass Services in the first instance, when in fact it was not because of Defendants' illegal, deceptive, unfair, and manipulative conduct directed at GEICO Insureds, and pervasive violations of the Repair Act.

164.    The Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Smart Ride that were not reimbursable.

165.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $144,000.00 pursuant to the fraudulent bills that were submitted or caused to be submitted by the Defendants through Smart Ride, including more than $75,000.00 in damages incurred by GEICO General Insurance Company, more than $19,000.00 in damages incurred by GEICO Indemnity Co., more than $40,000.00 in damages incurred by Government Employees Insurance Company, and more than $9,000.00 in damages incurred by GEICO Casualty Co.

166.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

167.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages in an amount to be determined at trial, but in no event less than $144,000.00, together with interest and costs, and any other relief the Court deems just and proper.

**EIGHTH CAUSE OF ACTION**
**Against All Defendants**
**(Unjust Enrichment)**

168.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 116 above.

169.    As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

170.    When GEICO paid the bills and charges submitted or caused to be submitted by the Defendants, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

171.    The Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that the Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

172.    The Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

173.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $144,000.00.

**JURY DEMAND**

174.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. demand that a Judgment be entered in their favor:

60

A.      On the First Cause of Action against Smart Ride, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Smart Ride has no right to receive payment for any pending bills submitted to GEICO;

B.      On the Second Cause of Action against Baker, Salko, Tenebaum, Meryash, Baumer, and Stealing Home, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $144,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.      On the Third Cause of Action against Baker, Salko, Tenebaum, Meryash, Baumer, Stealing Home, and Rekaba, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $144,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.      On the Fourth Cause of Action against all Defendants, compensatory damages in an amount to be determined at trial but in excess of $144,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2);

E.      On the Fifth Cause of Action against Baker, Salko, Tenebaum, Meryash, Baumer, and Stealing Home, compensatory damages in an amount to be determined at trial but in excess of $144,000.00, together with treble damages, reasonable attorney's fees, and court costs pursuant to Fla. Stat. 772.104;

F.      On the Sixth Cause of Action against Baker, Salko, Tenebaum, Meryash, Baumer, Stealing Home, and Rekaba, compensatory damages in an amount to be determined at trial but in excess of $144,000.00, together with treble damages, reasonable attorney's fees, and court costs pursuant to Fla. Stat. 772.104;

G.      On the Seventh Cause of Action against all Defendants, compensatory damages in an amount to be determined at trial but in excess of $144,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper; and

H.      On the Eighth Cause of Action against all Defendants, more than $144,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

Dated:          September 20, 2019

/s/ John P. Marino
John P. Marino (FBN 814539)
Lindsey R. Trowell (FBN 678783)
Kristen L. Wenger (FBN 92136)
SMITH, GAMBRELL & RUSSELL, LLP
50 North Laura Street, Suite 2600
Jacksonville, Florida 32202
Phone:  (904) 598-6100
Facsimile:  (904) 598-6204
ltrowell@sgrlaw.com
jmarino@sgrlaw.com
kwenger@sgrlaw.com

Barry I. Levy (pro hac vice pending)
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11550
Phone:  (516) 357-3000
Facsimile:  (516) 357-3333
barry.levy@rivkin.com

Attorneys for Plaintiffs, Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co.